Dan B. JUSTICE, Appellant/Cross–
Appellee,

v.

RMH AERO LOGGING, INC., and
Wausau Insurance Companies,
Appellees/Cross–Appellants.

Nos. S–9513, S–9544.

Supreme Court of Alaska.

Feb. 15, 2002.

Paul M. Hoffman, Robertson, Monagle & Eastaugh, P.C., Juneau, for Appellant/Cross-Appellee.

Patricia L. Zobel, DeLisio Moran Geraghty & Zobel, Anchorage, for Appellees/Cross-Appellants.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Did the Alaska Workers' Compensation Board erroneously adjust an injured employee's compensation rate by departing from the statutory formula for determining gross weekly earnings set out in former AS 23.30.220(a)(1)? Because we conclude that our holding in *Gilmore v. Alaska Workers' Comp. Bd.*[1] applies with limited retroactivity to the employee's claim for a compensation rate adjustment, and because substantial evidence supports the finding that the employee's past employment history is not an accurate predictor of his future wage losses resulting from the injury, we affirm the board's decision adjusting the employee's compensation rate.

## II. FACTS AND PROCEEDINGS

RMH Aero Logging, Inc. hired Dan Justice in February 1993 to work as a knot bumper. On June 3, 1993 Justice was injured while working for RMH at a logging camp near Ketchikan, when a helicopter's rotor wash caused the log on which he was standing to roll, pinning his right foot against another log.

Justice received medical treatment and was cleared to work without any restrictions, wearing heavy lace-up leather boots to prevent further injury. Despite being placed on light duty, Justice continued to experience significant pain in his right foot. Further medical examination revealed a fracture in his right forefoot.[2] Justice's last day of employment with RMH was June 30, 1993.

Because conservative medical treatment of Justice's injury—such as immobilization of the foot in a cast—did not entirely relieve the pain in his right foot, Justice underwent surgery in February 1994. After Justice recuperated from the surgery, Dr. Todd Kile rated Justice's permanent partial impairment (PPI) at four percent. Dr. Kile later increased Justice's PPI rating to eight percent.

After RMH filed a report of occupational injury or illness with the board in June 1993, Wausau Insurance Companies, RMH's workers' compensation insurer, voluntarily adjusted Justice's claim. Between July 10, 1993 and August 9, 1994, Justice received temporary total disability (TTD) benefits of $154 per week, based on his gross income (as indicated in his federal income tax returns) of $16,589 and $4,305 for 1991 and 1992 respectively.[3] Upon reaching medical stability in August 1994, Justice received PPI benefits based on Dr. Kile's rating of eight percent. On July 10, 1995—when his PPI benefits expired—Justice received a lump sum payment of $9,971 under former AS 23.30.041(k).[4]

Justice continued to experience pain after the February 1994 arthrodesis procedure be-

---

1. 882 P.2d 922 (Alaska 1994).

2. Justice was diagnosed with a "medial cuneiform fracture" in his right foot as well as a "possible Linsfranc injury."

3. Justice's weekly TTD benefits were calculated under former AS 23.30.220(a)(1). In 1993 AS 23.30.220 provided in relevant part:

 (a) The spendable weekly wage of an injured employee at the time of an injury is the basis for computing compensation. It is the employee's gross weekly earnings minus payroll tax deductions. The gross weekly earnings shall be calculated as follows:

 (1) the gross weekly earnings are computed by dividing by 100 the gross earnings of the employee in the two calendar years immediately preceding the injury.

 AS 23.30.220 was amended effective September 4, 1995. *See* ch. 75, §§ 9–10, SLA 1995.

4. Former AS 23.30.041(k) provided:

 Benefits related to the reemployment plan may not extend past two years from date of plan

cause of degenerative arthritic changes in his right foot. On October 13, 1997 Justice's right foot spasmed while he was working on the roof of his house. Justice fell from the roof, fracturing his right wrist and sustaining a fracture/dislocation of a joint in the long finger of his right hand. Justice underwent surgery in January 1998 to correct the fracture/dislocation. RMH agreed that Justice's October 1997 injuries were related to his June 1993 injury, and reinstated his TTD benefits effective September 1, 1997.

On December 1, 1997 Justice filed a workers' compensation claim with the board. On May 11, 1998 Justice filed an amended claim seeking, among other things, a retroactive adjustment of his TTD compensation rate. Justice claimed that his gross income in 1992 was aberrationally low and did not accurately predict his future lost wages. Justice explained that he had spent that year administering his mother's estate. Citing *Gilmore v. Alaska Workers' Comp. Bd.*,[5] Justice asked the board to depart from the formula, contained in former AS 23.20.220(a)(1), for determining gross weekly wages. The board agreed and retroactively adjusted Justice's weekly compensation rate to $424.30.

RMH appealed to the superior court, which affirmed the "retroactive application of *Gilmore* to Mr. Justice's 1997 TTD claim" and reversed "[t]he Board's order that *Gil-*

*more* be applied to Mr. Justice's 1993 TTD claim...."[6]

Justice appeals and RMH cross-appeals.

## III. DISCUSSION

### A. Standard of Review

 We independently review the merits of an agency determination when a superior court acts as an intermediate court of appeal.[7] "In reviewing an agency's factual findings, we employ the 'substantial evidence' test."[8] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9] When an agency decision involves expertise regarding either complex subject matter or fundamental policy formulation, we defer to the decision " 'so long as it is reasonable, supported by the evidence in the record as a whole, and there is no abuse of discretion.' "[10] We apply the substitution of judgment test to legal questions where no agency expertise is involved, such as questions of " 'statutory interpretation or other analysis of legal relationships about which courts have specialized knowledge and experience.' "[11]

### B. The Board Did Not Err by Applying *Gilmore* to Justice's Claim for a Compensation Rate Adjustment.

On October 14, 1994 we decided *Gilmore v. Alaska Workers' Comp. Bd.*, which held that

approval or acceptance, whichever date occurs first, at which time the benefits expire. If an employee reaches medical stability before completion of the plan, temporary total disability benefits shall cease and permanent impairment benefits shall then be paid at the employee's temporary total disability rate. If the employee's permanent impairment benefits are exhausted before the completion or termination of the reemployment plan, the employer shall provide wages equal to 60 percent of the employee's spendable weekly wages but not to exceed $525, until the completion or termination of the plan. A permanent impairment benefit remaining unpaid upon the completion or termination of the plan shall be paid to the employee in a single lump sum. The fees of the rehabilitation specialist or rehabilitation professional shall be paid by the employer and may not be included in determining the cost of the reemployment plan.

AS 23.30.041(k) was amended effective July 1, 2000. *See* ch. 105, § 4, SLA 2000.

5. 882 P.2d 922 (Alaska 1994).

6. The parties agree that the superior court mistakenly assumed that Justice had asserted two separate claims for compensation rate adjustment—i.e., a claim for the June 1993 foot injury and a claim for the October 1997 wrist injury.

7. *Thompson v. United Parcel Serv.*, 975 P.2d 684, 687–88 (Alaska 1999) (citing *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (citation omitted)).

8. *Id.* at 688 (citing *Jager v. State*, 537 P.2d 1100, 1107 (Alaska 1975) (citation omitted)).

9. *Id.* (quoting *Interior Paint Co. v. Rodgers*, 522 P.2d 164, 170 (Alaska 1974) (citation omitted)).

10. *Id.* (quoting *Ellis v. State, Dep't of Natural Res.*, 944 P.2d 491, 493 (Alaska 1997) (citation omitted)).

11. *Id.* (quoting *Earth Res. Co. v. State, Dep't of Revenue*, 665 P.2d 960, 965 (Alaska 1983) (citation omitted)).

**553**

former AS 23.30.220(a), as applied by the board to Gilmore, violated the equal protection clause of the Alaska Constitution.[12]

When Gilmore was injured on September 17, 1989, AS 23.30.220(a) provided in relevant part:

> The spendable weekly wage of an injured employee at the time of an injury is the basis for computing compensation. It is the employee's gross weekly earnings minus payroll tax deductions. The gross weekly earnings shall be calculated as follows:
>
> (1) the gross weekly earnings are computed by dividing by 100 the gross earnings of the employee in the two calendar years immediately preceding the injury;
>
> (2) if the employee was absent from the labor market for 18 months or more of the two calendar years preceding the injury, the board shall determine the employee's gross weekly earnings for calculating compensation by considering the nature of the employee's work and work history, but compensation may not exceed the employee's gross weekly earnings at the time of injury .... [13]

During the two years preceding his injury, Gilmore had worked for a total of thirty-nine weeks.[14] But for twenty-two of the thirty-nine weeks, Gilmore had been in vocational training programs learning to become a motorcycle mechanic.[15] Gilmore argued that he should be considered "absent from the labor market" within the meaning of AS 23.30.220(a)(2) while he was attending vocational training programs, and that he was therefore entitled to an alternative wage calculation under that statute.[16] The board rejected Gilmore's contention, and the superior court affirmed.[17]

At our request, the parties in *Gilmore* filed supplemental memoranda discussing whether AS 23.30.220(a)'s formula for determining an injured employee's gross weekly earnings violated the equal protection clause of the Alaska Constitution.[18] We held that it did, as applied to Gilmore, for the following reasons:

> The gross weekly wage determination method of AS 23.30.220(a) creates large differences in compensation between similarly situated injured workers, bears no relationship to the goal of accurately calculating an injured employee's lost wages for purposes of determining his or her compensation, is unfair to workers whose past history does not accurately reflect their future earning capacity, and is unnecessary to achieve quickness, efficiency, or predictability.[19]

But we noted that "section 220(a) may be applied constitutionally in a number of circumstances, for example, where an injured worker has had the same occupation for all of the past two calendar years."[20] Thus, the relevant inquiry under *Gilmore* is whether an injured worker's past employment history is an "accurate predictor" of future wage losses due to the injury.[21] Where past wage levels are an accurate predictor of losses due to the injury, "the Board must apply the statutory formula. The decision to depart from the statute must be based on substantial evidence supporting the conclusion that past wage levels will lead to an irrational workers' compensation award."[22]

We declined in *Gilmore* to address the extent to which its holding would be applied retroactively.[23] As Justice Compton noted in his concurring opinion,

---

**12.** *Gilmore*, 882 P.2d at 922–30.

**13.** Ch. 79, § 37, SLA 1988; *see also Gilmore*, 882 P.2d at 923 n. 1. AS 23.30.220 was amended effective September 4, 1995. *See* ch. 75, §§ 9–10, SLA 1995.

**14.** *Gilmore*, 882 P.2d at 924.

**15.** *Id.*

**16.** *Id.* at 924–25.

**17.** *Id.* at 925.

**18.** *Id.* at 923.

**19.** *Id.* at 929.

**20.** *Id.* at 930 n. 17.

**21.** *Thompson*, 975 P.2d at 689.

**22.** *Id.*

**23.** *See Gilmore*, 882 P.2d at 930 n. 18, 932.

[t]he question of prospectivity or retroactivity, and the type of prospectivity or retroactivity, will be addressed in the context of a case in which the question is essential to the decision. In the meantime, the past opinions of this court should serve as a basis for an informed decision by the Board.[24]

The board retroactively applied *Gilmore* to Justice's claim for a compensation rate adjustment.[25] Justice argues that the board correctly applied *Gilmore* to his claim. RMH responds that *Gilmore* should apply retroactively only "to workers who raised the issue prior to *Gilmore, had a claim open to adjudication at that time,* or who had preserved the issue for appeal when the decision was issued." (Emphasis added.) Because we conclude below that Justice's claim is open to adjudication,[26] we could hold that the board properly applied *Gilmore* to Justice's claim on the basis of RMH's concession alone. But, as we will see, our law governing the retroactive application of our decisions also demands that we affirm the board's decision to accord *Gilmore* the limited retroactivity necessary to reach Justice's claim.

### 1. The *Byayuk* factors dictate retroactive application of *Gilmore.*

▆▆▆ "There is no constitutional mandate, federal or state, requiring civil decisions to be applied either retroactively or prospectively. The determination whether to give retroactive effect to new decisional law is made ad hoc, on the basis of the practical and equitable considerations of each case."[27] We consider four factors in deciding whether

and to what extent new decisional law should be applied retroactively:

(1) whether the holding either overrules prior law or decides an issue of first impression whose resolution was not foreshadowed; (2) whether the purpose and intended effect of the new rule of law is best accomplished by a retroactive or a prospective application; (3) the extent of reasonable reliance upon the old rule of law; and (4) the effect on the administration of justice of a retroactive application of the new rule of law.[28]

In civil cases, limited retroactivity is the rule; exclusively prospective application is the exception.[29] "Absent special circumstances, a new decision of this court will be given effect in the case immediately before the court, and will be binding in all subsequent cases in which the point in question is properly raised," even if the events to which the law is applied occurred before the court's decision.[30]

The first *Byayuk* factor—whether a decision overrules prior law or decides an issue of first impression whose resolution was not foreshadowed—is actually a threshold test.[31] If *Gilmore*'s holding was clearly foreshadowed, the rule will apply retroactively; if, on the other hand, the question answered by *Gilmore* was "subject to rational disagreement," we must address the remaining factors.[32]

*Gilmore* was our first decision addressing the constitutionality of former AS 23.30.220(a). Furthermore, because *Gilmore* did not hold that AS 23.30.220(a) was facially unconstitutional,[33] but only that the statute as the board applied it to Gilmore violated

---

24. *Id.* at 932 (Compton, J., concurring) (citing *Metcalf v. Felec Servs.,* 784 P.2d 1386 (Alaska 1990); *Morrison v. Afognak Logging, Inc.,* 768 P.2d 1139 (Alaska 1989); *Vienna v. Scott Wetzel Servs., Inc.,* 740 P.2d 447 (Alaska 1987); *Suh v. Pingo Corp.,* 736 P.2d 342 (Alaska 1987)).

25. Justice was injured on June 3, 1993, before we decided *Gilmore* on October 14, 1994. *See* 882 P.2d at 922.

26. *See infra* Part III.B.3.

27. *Suh,* 736 P.2d at 344 (citation omitted).

28. *Commercial Fisheries Entry Comm'n v. Byayuk,* 684 P.2d 114, 117 (Alaska 1984).

29. *Id.* at 117 (citing *Plumley v. Hale,* 594 P.2d 497, 502 (Alaska 1979)).

30. *Vienna,* 740 P.2d at 449 (quoting *Plumley,* 594 P.2d at 502).

31. *Byayuk,* 684 P.2d at 117–18.

32. *Truesdell v. Halliburton Co.,* 754 P.2d 236, 239 (Alaska 1988) (citing *Vienna,* 740 P.2d at 450).

33. *Gilmore,* 882 P.2d at 929 n. 17.

the equal protection clause of the Alaska Constitution, the outcome in *Gilmore* was arguably "subject to rational disagreement." We therefore conclude that *Byayuk*'s threshold test is met and proceed to consider the remaining criteria.

■ The second *Byayuk* factor—whether the purpose and intended effect of the new rule of law is best accomplished by a retroactive or exclusively prospective application— "is the single most important criterion to use in determining whether to apply a new rule of law retroactively...."[34] The parties agree that *Gilmore*'s purpose, like the overall purpose of AS 23.30.220(a), is to ensure "a fair approximation of a claimant's probable future earning capacity during the period in which compensation benefits are to be paid."[35] Because a purely prospective application of *Gilmore* would deprive certain workers, such as Justice, of workers' compensation benefits based on a fair approximation of future earning capacity, *Gilmore*'s purpose is best accomplished by applying it retroactively.

■ The third *Byayuk* factor—the extent of reasonable reliance on the old rule of law—"is used to further weigh the merits of a [purely] prospective application and also to set the limits of retroactivity."[36] However, "this factor is of minimal importance where the purpose and intended effect of the new rule of law clearly justifies a retroactive application."[37] Furthermore, we have held that " '[a]n insurer's reliance interest is insufficient to [defeat retroactive] application of a change in the law unless the insurer presents a compelling case of grave financial consequences.' "[38] RMH argues that "the cost of opening and litigating all prior claims under former [AS 23.30.220(a)] ... constitutes a grave financial circumstance." But opening and litigating all prior claims is not the effect

of limited retroactivity. Limited retroactivity does not reopen final judgments; instead, it applies the new rule only to cases still open to adjudication. RMH has not demonstrated that grave financial circumstances would result from this limited retroactive application of the *Gilmore* decision.

The fourth *Byayuk* factor—the effect on the administration of justice of retroactively applying the new rule of law—is "useful in determining not only whether a new rule should apply retroactively but also how far the application should extend."[39] RMH argues that retroactively applying *Gilmore* would burden the entire workers' compensation system by allowing the relitigation of "all prior workers' compensation payments under former AS 23.30.220(a)." We disagree. Because we hold below that *Gilmore* is retroactively applicable only to cases which remain open to adjudication,[40] final judgments and other cases not open to adjudication will not be subject to relitigation. Furthermore, we have previously noted that "the fact that retroactive application of [a new rule of law] may increase the number of suits is not sufficient reason to limit retroactive application.... An increase in the amount of justice should not be recognized as a burden on the administration of justice."[41] Thus, the final *Byayuk* factor does not weigh against retroactive application.

### 2. To what extent should *Gilmore* be retroactively applied?

In *Vienna v. Scott Wetzel Servs., Inc.*,[42] we considered whether and to what extent *Alaska Pacific Assurance Co. v. Brown*[43] should be applied retroactively. *Brown* held that former AS 23.30.175(d) unconstitutionally reduced the compensation benefits of injured workers residing outside Alaska.[44] We held

34. *Byayuk,* 684 P.2d at 118.

35. *Gilmore,* 882 P.2d at 927 (citation omitted).

36. *Byayuk,* 684 P.2d at 119.

37. *Id.*

38. *Vienna,* 740 P.2d at 451 (quoting *Suh,* 736 P.2d at 348 (Matthews, J., dissenting)).

39. *Byayuk,* 684 P.2d at 119.

40. *See infra* Part III.B.2.

41. *Truesdell,* 754 P.2d at 241.

42. 740 P.2d 447, 449–52 (Alaska 1987).

43. 687 P.2d 264 (Alaska 1984).

44. *Id.* at 269–74.

in *Vienna* that the *Brown* decision applied retroactively to those workers whose claims remained open to adjudication, and to those who had preserved the issue for appeal.[45] Similarly, in *Metcalf v. Felec Servs.*, we held that the holding in that case would extend to workers' compensation cases "in the pipeline" as of the date of the court's decision.[46] This included "workers whose claims remain[ed] open to adjudication and those who [had] preserved the issue for appeal, assuming the time for appeal [had] not expired." [47]

■■■ We now hold that *Gilmore* is likewise retroactively applicable to workers whose claims remain open to adjudication, and to those who have preserved the issue for appeal. Indeed, as we noted above, RMH concedes that *Gilmore* should apply retroactively "to workers who raised the issue prior to *Gilmore*, had a claim open to adjudication at that time, or who had preserved the issue for appeal when the decision was issued."

### 3. Justice's claim for a compensation rate adjustment is open to adjudication.

RMH argues that *Gilmore* may not be retroactively applied to Justice's claim for a compensation rate adjustment because it is not "open to adjudication." RMH contends that because it did not controvert Justice's claim for workers' compensation benefits, and because Justice received the last benefits payment on July 10, 1995, AS 23.30.105(a)'s two-year statute of limitations expired on July 11, 1997.[48] Because Justice did not seek a compensation rate adjustment until May 11, 1998, RMH asserts that his claim is not "open to adjudication."

Alaska Statute 23.30.105(a) permits claims within two years after the date of the last payment of workers' compensation benefits paid without an award. But AS 23.30.105(b) provides that "[f]ailure to file a claim within the period prescribed in (a) of this section is not a bar to compensation unless objection to the failure is made at the first hearing of the claim in which all parties in interest are given reasonable notice and opportunity to be heard." Justice contends that because RMH did not object at the November 9, 1998 hearing—the first (and only) hearing before the board—his claim is not barred by AS 23.30.105(a)'s two-year statute of limitations, and is therefore open to adjudication.

We ordered supplemental briefing in this case addressing the following issues: (1) "When and to what extent RMH was placed on notice that Justice was seeking to recover additional compensation for the period of disability between 1993 and 1995"; and (2) "What opportunity RMH had to argue that any attempt to make a change in the compensation rate applied to the period between 1993–95 was untimely."

Justice argued in his opening supplemental brief that RMH was placed on notice that Justice was seeking to recover additional compensation for the period of disability between 1993 and 1995 on March 1, 1998, when he sent a letter to the board asking "for an adjustment of [his] weekly compensation rate *retroactive to 7-10-93 to 8-9-94 (56 weeks)* [and] 9-1-97 to 3-1-9[8] (26 weeks) and beyond." (Emphasis added.) In that letter, Justice requested back compensation of $11,180.70 and a new weekly compensation rate of $290.35. Justice enclosed his calculations explaining how he arrived at $11,180.70. Those calculations reveal that Justice was seeking an additional $7,635.60 in compensation for the period between July 10, 1993 and August 9, 1994. The board treated Justice's letter as a claim and served it on Wausau Insurance Companies on March 6, 1998.

Thus, RMH was on notice as of March 6, 1998 that Justice was seeking additional compensation for the period of disability between 1993 and 1995. But in any event, RMH candidly concedes in its opening supplemental brief that it "was first put on notice that Mr. Justice was seeking a retroactive com-

---

**45.** *Vienna,* 740 P.2d at 452.

**46.** 784 P.2d 1386, 1391 n. 4 (Alaska 1990).

**47.** *Id.*

**48.** AS 23.30.105(a) provides that "if payment of compensation has been made without an award on account of [an] injury or death, *a claim may be filed within two years after the date of the last payment of benefits* ...." (Emphasis added.)

pensation rate adjustment for benefits paid between 1993 and 1995 on August 10, 1998 at the prehearing at which it was made clear that a retroactive application of the *Gilmore* decision was being sought." RMH therefore had notice of Justice's claim for a retroactive compensation rate adjustment for benefits paid between 1993 and 1995 before the November 9, 1998 AWCB hearing.

 Because RMH was placed on notice of Justice's claim for a retroactive compensation rate adjustment before the November 9, 1998 hearing, and because RMH did not object at that hearing to Justice's failure to file a claim within the period prescribed by AS 23.30.105(a), we hold that RMH waived its statute of limitations defense, and that Justice's claim is therefore "open to adjudication." We therefore conclude that it was not error to apply *Gilmore* to Justice's claim.

### C. It Was Not Error to Find that Justice Was Entitled to a Compensation Rate Adjustment Under *Gilmore*.

RMH argues that even if the board properly applied *Gilmore* retroactively to Justice's claim, it erred by finding that Justice was entitled to an adjustment under *Gilmore*, because (1) the board applied a generalized "fairness" analysis to Justice's claim, and (2) substantial evidence does not support the finding that Justice's past employment history is not an accurate predictor of his future lost income.

### 1. The AWCB did not base its decision to grant Justice a compensation rate adjustment solely upon a "fairness" analysis.

In *Thompson v. United Parcel Serv.*, we held that it was error, under *Gilmore*, for the board to depart from the formula in former AS 23.30.220(a)(1) by conducting a "generalized fairness inquiry rather than asking whether Thompson's past earnings could accurately be used to determine what she would have earned had she not been injured." [49]

RMH argues that the board erred by granting Justice a compensation rate adjustment based on a generalized fairness inquiry. RMH claims that the board made no findings regarding whether Justice's past earnings were an accurate predictor of future lost earnings.

It is true that the board stated that "the court's decision in *Gilmore* requires that a 'fairness' analysis be applied in cases such as this." But the board also found that there was "a substantial disparity in [Justice's] earnings at the time of his injury and his earnings, as computed under subsection 220(a)" and that Justice "would have worked more time per year than he had in the past, based on his desire to purchase a house and on his need to no longer care for his mother." These findings addressed the relevant inquiry under *Gilmore*—i.e., whether Justice's past earnings were an accurate predictor of his future lost earnings. We therefore perceive no error.

### 2. Substantial evidence supports the finding that Justice's past employment history is not an accurate predictor of his future lost income.

 RMH next argues that substantial evidence does not support the finding that Justice's past employment history is not an accurate predictor of his future lost income. RMH argues that Justice's work history "demonstrates sporadic and seasonal employment ... with significant periods of unemployment in every year pre-injury," and that Justice's gross earnings in 1991 and 1992 are not "a great aberration compared with his historical wages...."

Because the question of the reliability of an injured employee's past work history as a predictor of future lost income is factual in nature, we review the board's findings on that issue "under the substantial evidence test, viewing whether the evidence relied upon was substantial in light of the record as a whole." [50]

 Here, substantial evidence supports the board's finding that Justice's past

---

49. *Thompson*, 975 P.2d at 689.

50. *Id.* at 690 (citations omitted).

employment history is not an accurate predictor of his future lost income. First, there was "a substantial disparity in [Justice's] earnings at the time of his injury and his earnings, as computed under ·subsection 220(a)." Justice earned $23,425 between February and June 1993 working for RMH. In contrast, he earned $16,589 in 1991 and $4,305 in 1992. Although a "substantial difference" between an injured worker's award under former AS 23.30.220(a)(1) and his or her gross weekly earnings at the time of injury "does not per se indicate a lack of predictive value," it is relevant evidence that the board may consider.[51] Furthermore, Justice testified that he intended to increase the amount of his employment in order to earn the necessary funds for a down payment on a house. An injured worker's intentions at the time of injury regarding future employment are relevant to determining the reliability of the employee's past work history as a predictor of future lost income.[52] Finally, at the time of his injury, Justice no longer needed to care for his ailing mother, who passed away in March 1992. We therefore hold that the board did not err by granting Justice a compensation rate adjustment under *Gilmore*.

## IV. CONCLUSION

For these reasons, we agree with the Alaska Workers' Compensation Board's resolution of Justice's claim for a compensation rate adjustment. Accordingly, we AFFIRM that part of the superior court's decision affirming the board and REVERSE that part of the superior court's decision reversing the board and REMAND with instructions to affirm the entirety of the board's resolution of Justice's claim for a compensation rate adjustment.